**MURRAY v. ATLAS PIPE LINE CO.,**
Inc., et al.

No. 5089.

Court of Appeal of Louisiana.
Second Circuit.

June 29, 1935.

Blanchard, Goldstein, Walker & O'Quin, of Shreveport, for appellants.

T. Overton Brooks, of Shreveport, for appellee.

MILLS, Judge.

This is a third suit brought within two years, against different defendants, based on separate and distinct occurrences, alleged to have so injured plaintiff's back that he was permanently totally disabled and entitled to 400 weeks' compensation under the provisions of Act No. 20 of 1914, § 8, as amended by Act No. 242 of 1928, p. 357. The first suit he settled for $475; the second for $250; and this he was willing to compromise for $1,000.

The employer in the present case, after paying medical expenses and 23 weeks' compensation, has refused to pay more, contending that plaintiff suffered no accident and received no injury while in its employ.

There was judgment below for plaintiff as prayed for, from which defendant has appealed.

On April 2, 1933, plaintiff was completing the seventh day's work of a temporary 10 days' employment by the Atlas Pipe Line Company, Inc. He was one of a crew engaged in installing a booster station on one of its lines at a point about two miles from Shreveport, on the Minden road in Bossier parish. To get at the 6-inch line of pipe, a ditch 2 feet wide and about as deep had been dug and the dirt therefrom thrown out on one side. The crew, at the time of the alleged accident, was engaged in refilling the ditch. This was accomplished by parking a truck on the opposite side of the ditch from the dirt to be moved, and by means of its power dragging the dirt back into the ditch with a Marmon board. The power was transmitted by means of a revolving winch or cathead connected with the motor about which a rope was looped with one end in the hands of a workman who regulated the drag by tightening or loosening the loop. The other end was tied to a forked hook which was fastened about one-third of the way up to an oblong flat metal plate called a Marmon Board. This board was 48 inches long by 20 inches wide, and weighed about 50 pounds. Handles projected up about a foot at each end. By means of these handles, workmen placed the board lengthwise back of the piled dirt, and held it at an angle to the ground so that as it was slowly pulled forward by the power from the truck the dirt would be dragged into the ditch.

Plaintiff's story is that the place was deep in river mud from recent rains; that he and Mangham had hold of one handle as the board was being pulled forward; that Mangham bogged down in the mud and let go, throwing all the load on him. Just then Robinson, on the truck, suddenly let out the clutch, jerking plaintiff into the ditch. He claims that the pipe therein had not been covered and that he landed on it with his left side, injuring his back. He reported the injury, and was sent to a sanitarium of his own selection in Shreveport. He claims that Montgomery and Bishop were on the other handle, and that Atkinson was in the middle of the board.

On the first trial he produced none of these men, and no other eyewitness to corroborate his hazy and indefinite account of the accident. As a sample of his uncertainty we quote:

"A. No, I would not say I hit the pipe on my back—hit the pipe on the side— fact is, I could not say just how it was.

"Q. Was side or back? A. Yes, on left side.

"Q. You hit the pipe cross-ways the pipe? A. Well, yes, bound to have been cross-ways because was not straight.

"Q. You cross ways the pipe and landed on your left side on the pipe? A. I could not say whether I landed on the left side or not. I can say when he gave the jerk on the truck he jerked me, my end of the load in the ditch—he says, did it hurt you,—I says, I don't know, and one of the boys says, you look pretty pale."

It is difficult for the court to conceive how a man could have so fallen to the bottom of a 2-foot ditch.

The first trial was had November 23, 1933. On May 4, 1934, a motion by plaintiff to reopen on the ground of the discovery of two eyewitnesses, B. R. Randall and Drew Fincher, was granted.

Randall testifies that he was shoveling on the job; that he saw the truck make a sudden jerk and throw Murray over the board and into the ditch on his back; that the same jerk tore the board from the grasp of the other men and threw them to the ground. He admits that he worked as a shovel man on the job only one day. The company shows from its authenticated records that that day was April 1st, and not the day of the alleged accident.

Fincher gives a rambling recital, part of which we quote:

"Q. Did you see him fall in? A. I seen him slip, yes, sir—fall—don't know whether he turned a flop or not.

"Q. Throw him over the marmon board? How did he get to the ditch? A. Over the handle.

"Q. Over the handle, how do you mean —was he thrown a somersault or how? A. I just said I don't know."

The company shows by its same records, that at the time alleged, this man was working seven miles from the booster station.

Neither of these men was mentioned by plaintiff on the first trial as being present.

Defendant pipe line company shows that the cathead is unconnected with the clutch and runs steadily at one speed; that it pulls the board very slowly and cannot jerk. They prove by testimony and by pictures that not more than one man can work on a handle at the same time; that they "spell" each other, but do not both grasp the handle.

Mangham, Montgomery, and Atkinson, who were working on the board with Murray, and Robinson, in charge of the truck, all testify that no such accident happened as described by Murray and his witnesses. Atkinson is no longer with the company. These men were in the best position to see, and could not have failed to see, any such unusual occurrence. Their testimony is positive and straightforward, and impresses us with its truth and probability. Murray did quit work about 11 o'clock in the morning, claiming to have jerked a kink in his side. He was sent by the company to the sanitarium of his choice in Shreveport. There he was received and examined by Dr. J. R. Brown, who testified that he found no bruises, abrasions, or other objective symptoms of injury; that he accepted plaintiff's complaint of pain and treated him accordingly. In the course of these treatments he became convinced that plaintiff was malingering.

Dr. J. C. Willis, Jr., Dr. W. S. Harmon, and Dr. J. M. Gorton corroborate Brown as to objective symptoms of injury. Dr. S. C. Barrow X-rayed plaintiff after each one of the three alleged accidents. He testifies that there are some irregularities in plaintiff's back, but the condition appears identical in all three pictures. Dr. Oscar O. Jones, a specialist in X-ray work, also took plates which he says show negative as to any injury. He also testifies that he can discover none from the pictures taken by plaintiff's specialist.

For plaintiff besides the roentgenologist, two physicians testify to a chronic infectious arthritic condition in plaintiff's back. One claims to have detected a slipping of the sacroiliac joint. After reading this expert testimony carefully, we are forced to conclude, on the question of injury, that it preponderates largely in favor of defendants.

The burden is upon a plaintiff to prove his case with reasonable certainty by a clear preponderance of the evidence. Though the provisions of the Compensation Act (Act No. 20 of 1914, as amended) are liberally construed in favor of the workman, the rule as to proof of facts is the same in compensation cases as in other civil suits.

Considering the three suits brought by plaintiff for injuries to his back on three separate occasions, the improbability of his story and its contradiction in several instances by the physical facts and almost in toto by the four men who were working with him, we are not satisfied that plaintiff has discharged the burden resting upon him of proving the occurrence of an accident.

The judgment appealed from is accordingly reversed, and judgment rendered rejecting plaintiff's demand, with costs of both courts.