## SANDERS v. E. I. DUPONT de NEMOURS & CO.

### No. 2098.

Court of Appeal of Louisiana.
First Circuit.
April 10, 1940.

Rownd & Tycer, of Hammond, and J. Oliver Bouanchaud, of Baton Rouge, for appellant.

Taylor, Porter & Brooks, of Baton Rouge, for appellee.

DORE, Judge.

This is a suit under the Workmen's Compensation Act, Act No. 20 of 1914, wherein it is alleged that plaintiff sustained acute lead poisoning while employed as a painter in defendant's plant at Baton Rouge, as the result of fumes emanating from the melting pots of lead in the said plant. He claims the maximum weekly compensation of $20 per week from the date on which he became suddenly ill from the alleged acute lead poisoning for a period not to exceed 400 weeks, less 13 weeks during which he admits receiving his wages, plus $250 for medical expenses, and the costs of this suit.

The defendant admits that the plaintiff was employed by it at its plant in Baton Rouge at the time of his alleged illness, but denies that he ever suffered from lead poisoning. In the alternative, in the event that it should be found that plaintiff is suffering from lead poisoning, the defendant pleads that such lead poisoning is not an acute case, and consequently must be classed as an occupational disease and not within the scope of the Compensation Act.

After a lengthy trial, the lower court rendered judgment in favor of the defendant, dismissing plaintiff's suit. The plaintiff has appealed.

It seems clear from the evidence that the date on which plaintiff became ill was March 2nd, 1938, and not January 31, 1938, as alleged in his petition. The only question involved in the case is whether or not plaintiff's illness occurring on March 2nd, 1938, was acute lead poisoning sustained in defendant's plant.

A review of the voluminous record in this case reveals that the case must be determined largely by the probative value to be attached to contradictory medical testimony, all of which appears to have been given in good faith. We agree with the trial court that all the various medical experts apparently have tried to present their opinions of plaintiff's condition frankly and without bias.

It is shown that the plaintiff, on March 2, 1938, at which time he had been in the employ of the defendant for some fourteen months, was engaged in painting pipes in the furnace room of defendant's building known as the Sludge Building. It appears that this furnace room is approximately 120 feet long by 75 feet wide, with a ceiling 60 feet high, and is well ventilated. In this room are located furnaces, a dross pot, and pigging tables, used in the melting of lead. The dross pot, and the pigging tables, are equipped with exhaust pipes or vents through which air is blown out of the building. It is obvious that everything possible has been done to make this building safe for those employed in it, but, in spite of these precautions, it is admitted that the fumes from the melting lead are highly dangerous, and the employees themselves are made to follow certain safety rules, including the wearing, at times, of masks and respirators, to guard against the dangers of these lead fumes, and every three weeks they are subjected to examination to ascertain if they show any signs of lead poisoning.

It is not shown for how long the plaintiff had been employed in this particular place, and whether the location of his work prior to March 2nd was safer or more dangerous. It appears that the last time plaintiff was examined for possible lead poisoning prior to the illness of which he complains was on about January 18, 1938, at which time he showed no signs of lead poisoning. It is apparent, then, that if he sustained lead poisoning at all, it was an acute attack, since, according to medical testimony, lead poisoning sustained during so short a period of time as intervened between his last examination and the date of his alleged attack could not be considered chronic.

It appears that while painting in the above described furnace room, where lead was being melted in the vats therein, the plaintiff became ill and thereupon complained to Dr. Watson, the plant physician, who advised him to go home and consult his family physician, and requested him to return the next day for the purpose of having certain tests made. Dr. Watson explains that the defendant company does not

treat its employees except in cases involving injuries received at the plant, and for minor ailments, such as colds and headaches, and that when such minor ailments become too severe to permit the employee to continue work he is advised to go home and consult his family doctor.

Following Dr. Watson's advice, the plaintiff attempted to walk home, having failed to obtain any other way to go, and after a short distance, according to his testimony, due to cramps, nausea and weakness, he was compelled to lie down by the side of the road. Shortly thereafter, he was picked up by a passerby in a truck, and was afterward taken to the office of Dr. Lawton, a general medical practitioner in Baton Rouge, who testifies that when he reached his office the plaintiff was in a state of collapse, complained of being dizzy, was in severe pain with contraction of the muscles of the stomach, cramps, wrist drop and vomiting. Dr. Lawton testifies further that he found evidence of lead in specimens of plaintiff's blood and urine, and found a lead line on plaintiff's gums; and that from all the symptoms which he found he immediately came to the conclusion that plaintiff had acute lead poisoning for which he treated him for several months thereafter.

The day after the alleged acute attack, on March 3, 1938, Dr. Watson, defendant's local physician, made a test of plaintiff's blood, as well as a test of his urine, which showed no abnormal symptoms, and sent two samples of plaintiff's blood and one of his urine to Dr. R. A. Kehoe, of Cincinnati, eminent pathologist, nationally known as an authority on lead poisoning, and consultant of defendant company, who examined these specimens by the most modern and scientific methods, and failed to find therein any indication of lead poisoning.

Dr. Watson testifies further that he examined plaintiff's blood and urine again on June 2nd, and examined his blood again on June 19th, and found no abnormal symptoms. He states that he never at any time observed that plaintiff had paralysis or a lead line, and that on March 2nd, when plaintiff reported to him, he complained of a pain under his right rib margin, of a headache and generally feeling badly, but never mentioned that he was suffering from cramps. Dr. Watson admitted on cross-examination that his own examinations of plaintiff did not result in his arriving at the positive conclusion that plaintiff had lead poisoning or not, but that from the findings of Dr. Kehoe he was of the positive opinion that the plaintiff did not have lead poisoning.

On March 14, 1938, Dr. Beven, pathologist of Our Lady of the Lake Sanitarium in Baton Rouge, examined plaintiff's blood at the request of Dr. Lawton, and found no evidence therein of lead poisoning. Dr. Beven appears to be the best qualified physician, by reason of training, experience and laboratory equipment, to perform diagnostic tests, in the vicinity of Baton Rouge; yet he frankly admitted that he was not equipped to examine the urine for lead; that such examination to be of value should be done quantitatively, as was done by Dr. Kehoe, and that such test required special equipment and technique.

Dr. G. H. Gehrmann, medical director of the defendant company, testified that, while on an inspection visit to Baton Rouge, on March 23d, 1938, he went to plaintiff's home in company with Dr. Watson, to see the plaintiff and to determine, if possible, what was wrong with him. He stated that he had previously reviewed the entire history and all the physical findings and laboratory examinations, and that, after seeing the plaintiff, he reached the conclusion that plaintiff did not have lead intoxication; that plaintiff had no paralysis, wrist drop, lead line or other symptoms of lead poisoning.

Dr. C. L. Attaway, diagnostician in the Ardoin Sanitarium at Ville Platte, Louisiana, testifies that on May 28, 1938, he made an examination of plaintiff based on a routine history of the case, observation of the patient and a blood test. He reached the conclusion that plaintiff was suffering from lead poisoning, such conclusion being founded largely on the fact that plaintiff had been exposed to lead fumes, and complained of weakness, especially of the legs, the right forearm and wrist, of cramping intestinal pains, nervousness, irritability, nausea, loss of appetite, and insomnia with hallucinations at night, and the further facts that the blood showed 105 stippled cells per million, and that he found a lead line on plaintiff's gums. He states further that he examined plaintiff's urine and found it to be negative, but made no special test for lead.

Dr. C. D. Overton was called by the plaintiff on rebuttal, and devoted a large part of his testimony in attempting to show

that Dr. Kehoe's published articles contradicted his testimony in this case. He testified further that he examined the plaintiff in June, 1938, and again in February, 1939; that in his first examination he found a partial paralysis of the muscles of the hands and forearm, and wrist drop; that from the history of the case he concluded that plaintiff's condition was caused by lead poisoning. On cross-examination he admitted that he did not find a lead line.

Dr. Voss, a general practitioner, examined the plaintiff almost a year after the alleged attack, and found that he showed some signs of paralysis or dropping of the wrists; that the urine was negative; that the blood contained red cells in varying size, stippled cells in moderate amounts, and hemoglobin slightly below normal; that from these symptoms and the history plaintiff gave of being exposed to lead, he reached the opinion that the plaintiff was suffering from lead poisoning. He admitted that every sign which plaintiff exhibited, aside from the subjective symptoms and history, could indicate some other disease.

Dr. Philip Jones, formerly house physician at the Charity Hospital in New Orleans, who examined the plaintiff some eleven months after his alleged acute attack, contradicted Dr. Voss, in that he failed to find what he refers to as the "hang-over" effects of lead; to wit, wrist drop and foot drop. This physician testified further that, while he was unable to come to an exact, proven diagnosis of plaintiff's disease, he came to the definite conclusion that he did not have lead poisoning; that there was no evidence of lead in his urine or blood, and no indication of "hang-over" effects of lead poisoning; that he believed plaintiff's condition was due to an acute inflammatory state of the intestines of the type of dysentery due to a bacillus.

Dr. Nadler, a biologic chemist, made an examination of plaintiff's urine for lead several months after the alleged acute attack and found nothing abnormal.

Dr. I. A. Robins testified that based upon the history of the case and physical examination of plaintiff in February, 1939, he was of the opinion that plaintiff had some form of dysentery.

Dr. John McKowen examined plaintiff in February, 1939, and failed to find indications of lead poisoning, but concluded from plaintiff's symptoms and history that he was suffering from one of the forms of dysentery. He stated further that plaintiff would not submit to a proctoscopic examination because of the sensitiveness of his rectum.

In the final analysis, it appears that this case resolves itself into a controversy between Dr. Lawton for the plaintiff, whose testimony is corroborated to some extent by other physicians, and Dr. Kehoe for the defendant, whose findings and testimony are also corroborated by the other physicians.

The strength of Dr. Lawton's position lies in the fact that he was the first physician to prescribe for the plaintiff following his sudden illness. The weakness of his position lies in the fact that, while he appears to be a competent general practitioner of medicine, he did not possess the scientific knowledge or laboratory equipment to properly test plaintiff's blood or urine for lead. It is shown that in the blood examination, for instance, he counted the stippled cells without even staining the smear, which according to the other doctors could not be an accurate method. As to the examination of the urine, while Dr. Lawton is positive that he found lead therein in abnormal quantity, the medical testimony predominates to the effect that the urinalysis for lead as conducted by him was not accurate and that this test to be of value must be made with special equipment and under scientific methods.

Dr. R. A. Kehoe, on the other hand, did not have the advantage of seeing the plaintiff but he tested specimens of plaintiff's blood and urine, taken the day after his sudden illness, under the most modern and scientific methods and failed to find therein any indication of lead in abnormal quantities. He is recognized as an authority on lead poisoning and testifies positively that had the plaintiff been suffering from lead poisoning it would have shown up in his blood and urine.

Besides the fact that this eminent authority failed to find lead in abnormal quantities in plaintiff's blood and urine, we cannot from any of the other testimony conclude that there were indications of lead poisoning in either the blood or urine. Drs. Bevin and Watson testify positively that there was no lead poisoning revealed by plaintiff's blood examined shortly after the illness; and they, as well as all the other doctors, except Dr. Lawton, found nothing

abnormal in the urine, although they all seem to agree that special laboratory equipment and technique, which they lacked, is necessary to test the urine for lead.

As to the other symptoms testified to by Dr. Lawton and plaintiff's other physicians, and denied to some extent by defendant's expert witnesses, it seems to be clearly shown, as found by the trial judge, that the plaintiff was a sick man, but it is not shown by these symptoms that he necessarily had lead poisoning.

The symptoms appear to be typical of lead poisoning, but they also occur in other diseases, except possibly the lead line, and with reference to that particular symptom the testimony is highly controversial; first, as to whether or not plaintiff had any blueness of the gums at all, and second, admitting that he had a blue line or film on his gums, similar to a lead line, as to whether or not this was caused by the admittedly bad dental condition of his mouth, including pyorrhoea.

Moreover, from the medical testimony as to the nature of lead poisoning, it is difficult to believe that plaintiff would have been suffering from lead line and some of the other symptoms found by Dr. Lawton so soon after an acute attack of lead poisoning. The testimony predominates to the effect that the lead line, and some of the other symptoms found by Dr. Lawton, do not appear until three to six weeks subsequent to an acute poisoning by lead.

It is unfortunate that no positive determination of plaintiff's malady was made by the many doctors who have examined him. However, their failure to make a positive diagnosis of his trouble may be due to plaintiff's failure to co-operate in examinations for anything but lead poisoning. We are somewhat impressed by the testimony that plaintiff is suffering from a form of dysentery.

In any event, in the light of the evidence and these considerations, we cannot find wherein the trial court erred in concluding that the plaintiff had failed to prove his case with that degree of certainty required, as set forth in the cases cited by the lower court, to wit: Leon v. Great American Ind. Co., La.App., 146 So. 351; Barrett v. Wilson, La.App., 152 So. 795; Murray v. Atlas Pipe Line Co., La.App., 162 So. 466; Olsen v. Texas Co., La.App., 161 So. 219.

Accordingly, the judgment below is affirmed.